**In re McLEAN INDUSTRIES, INC., United States Lines, Inc., United States Lines (S.A.), Inc., First Colony Farms, Inc., Debtors.**

**Bankruptcy Nos. 86 B 12238–41 (HCB).**

United States Bankruptcy Court,
S.D. New York.

June 24, 1988.

See also, Bkrtcy., 84 B.R. 340.

Milbank, Tweed, Hadley & McCloy New York City by Risa Rosenberg, of counsel, for the debtor-in-possession.

Kronish, Lieb, Weiner & Hellman, New York City by Lisa Solomon, of counsel, for the Public Debt Holders Committee of McLean Industries, Inc.

Semel, Patrusky & Buchsbaum, New York City by Leon Stand, of counsel, for Merchant Mariners.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Semel, Patrusky & Buchsbaum ("SP & B"), as counsel to certain merchant seamen who have filed claims for damages against United States Lines, Inc., seeks an order, apparently pursuant to 11 U.S.C. § 503(b)(3) and (4) (1986), awarding them compensation of $84,720 as attorneys for creditors who have made a substantial contribution to the Bankruptcy case of United States Lines' affiliate, McLean Industries, Inc. ("McLean" or "Debtor"). The claim for compensation consists of $9,720 for attorney's fees and an additional $75,000 reward for "salvaging" the debtor's estate. The motion is opposed by the debtor-in-possession, the Committee of Unsecured Creditors and the Public Debt Holders Committee of McLean Industries, Inc. ("Debentureholders Committee") on the basis that SP & B has not made a substantial contribution to the amount recovered by the estate and that reliance on salvage principles is inappropriate. In these jointly administered but unconsolidated cases, no claim is made that SP & B, as attorneys for creditors of the United States Lines estate, do not qualify under 11 U.S.C. § 503(b)(4) in contributing to the McLean estate.

I.

The contribution claimed by SP & B arises from its objection to a post-petition agreement between McLean and Halifax Grain Elevators ("Halifax"), whereby Halifax was to purchase, for $350,000 and sub-

ject to court order and higher and better bids, stock issued by Arecibo Paper Mills Inc. ("Arecibo") and Productos Forestales Caribe, Inc. which are owned by McLean. Arecibo is owner of a paper mill located in Puerto Rico that is encumbered by a $1.5 million dollar mortgage and has been inoperative for ten years. Halifax is owned in part by Allen Stevens, a director and former officer of the Debtor. McLean chose to accept Halifax's immediate cash offer rather than a lease proposal from Nolichucky Industries.[1] The lease with Nolichucky would have provided McLean with only monthly rentals dependent upon the success of the mill. McLean chose to accept Halifax's offer of $350,000 cash for the stock due to the speculative nature of the mill's prospective operations.

A hearing was held on February 18, 1988 on the motion to approve the sale of the stock. At that hearing, SP & B asserted the initial objection, raising a substantial issue as to the sufficiency of the purchase price, and offered a single page document obtained from a Puerto Rican bank which stated that the property in question has a value of $7 million. Following SP & B's objection, other parties in interest, particularly the Debentureholders Committee, asserted their concern for the propriety of the sale to Halifax, given Stevens' insider status. The Court, following *Ross v. Kirschenbaum (In re Beck Indus. Inc.)*, 605 F.2d 624 (2d Cir.1979), then ordered that an evidentiary hearing was required with respect to the propriety issue and the hearing was adjourned until March 11, 1988 in order to give the parties an opportunity to consider all the various issues.

In the interim prior to the adjourned hearing, Abraham Zion, the principal of Jacksonville Kraft Paper Co., apparently had approached the Debtor and expressed an interest in making a cash offer for the stock after being informed of the sale by the Committee of Unsecured Creditors. Bidding for sale of the stock took place between Nolichucky and Zion and, ultimately, the stock was sold to Nolichucky for $1.5 million dollars—$1,150,000 more than Halifax's initial offer.

SP & B asserts that it raised the sole objection to the original bid of $350,000, thereby causing the hearing to be adjourned and permitting the submission of the $1.5 million bid. Thus, SP & B claims sole responsibility for a substantial increase in the value of the estate. SP & B submitted a notice of motion on April 18, 1988, seeking compensation in the amount of $84,720.00 consisting of $9,720 for attorney's fees and a $75,000 premium for "salvaging" $1,150,000 for the estate.[2] The motion was heard on May 10, 1988.

## II.

Bankruptcy Code 11 U.S.C. §§ 503(b)(3) and (4) permit the court to allow as administrative expenses reasonable compensation for professional services rendered by attorneys or accountants and reimbursement for actual, necessary expenses incurred by such attorneys and accountants. The basic test of recovery is that a claimant must have made a "substantial contribution" to the estate as demonstrated by benefit to the estate, the creditors and, to the extent relevant, the stockholders. *In re Rockwood Computer Corp.*, 61 B.R. 961, 965 (Bankr.S.D.Ohio 1986). Extensive participation in a case alone is insufficient to compel compensation under § 503(b). *In re D.W.G.K. Restaurant, Inc.*, 84 B.R. 684, 690 (Bankr.S.D. Cal.1988). A creditor must generally look to his or her own client for payment. *E.g., In re Jensen–Farley Pictures, Inc.*, 47

---

1. The would-be purchaser, Halifax, had already entered into a management contract with Nolichucky in the event that Halifax purchased the property.

2. In its notice of motion dated April 18, 1988, SP & B claimed $9,720 as its attorney's fees for 54 hours at a normal hourly rate of $180 per hour. In a subsequent memo, dated May 13, 1988, attached to reconstructed time sheets submitted by the firm, SP & B lists 43½ hours of work by it in addition to 16 hours of work by David Efron, Esq. an attorney in Puerto Rico, at SP & B's request. Mr. Efron has not submitted a fee application, accompanied by time records, to this Court and thus may not recover his fee from the estate on this motion. Accordingly, SP & B's time amounts to 43½ hours less 9 hours of disallowed time or 34½ hours.

B.R. 557, 573 (Bankr.D.Utah 1985). If, however, an attorney renders services not only on behalf of his or her client's interests, but he or she also confers a significant and demonstrable benefit upon the creditors of the estate, the expenses thereby incurred should be compensated. *In re Romano*, 52 B.R. 590, 593 (Bankr.M.D.Fla. 1985); *In re General Oil Distribs., Inc.*, 51 B.R. 794, 806 (Bankr.E.D.N.Y.1985); *Jensen–Farley*, 47 B.R. at 569; *In re Richton Int'l Corp.*, 15 B.R. 854, 856 (Bankr.S.D.N. Y.1981).

■ We find that SP & B has conferred a benefit upon the estate. The "substantial contribution" SP & B made was that it raised the initial objection to the sale of the Arecibo stock and thereby seemingly prompted others to assert their position concerning the propriety of the sale to Halifax. While such objections might have been made in any event, it was clear to the Court at the hearing, and the transcript confirms, that had the price issue not been raised, the objection to the propriety of the transaction might not have been made. Indeed, there was concern at the hearing that, since approval of the arrangement with Halifax had to be obtained by a date certain, an adjournment might prejudice the estate.

We reject the notion, however, that SP & B made the sole objection as it claims. After SP & B's initial objection, counsel for the Debentureholders Committee expressed reservations regarding the stock sale. In fact, it was counsel for that committee who actually proposed the adjournment at the February hearing. This Court agreed with said counsel and expressed a substantial concern regarding Stevens' "insider" status. The February hearing was thus adjourned to allow all concerned parties to consider these issues more fully.

### III.

While SP & B's efforts made a substantial contribution which inured to the benefit of the estate, the question remains as to fixing the amount of its claim. Section 503(b)(4) provides for:

reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

The fee sought by SP & B has two distinct elements: time charges and salvage. Both elements of the application, as one for allowances of administrative expenses, must be carefully scrutinized. *In re D.W.G.K. Restaurant Inc.*, 84 B.R. 684, 689 (Bankr. S.D.Cal.1988); *In re Saroca*, 46 B.R. 533, 535 (Bankr.D.Me.1985).

■ The lodestar method of determining reasonable attorney's fees is calculated by multiplying the hours spent on a case by a reasonable hourly rate of compensation for each attorney. *Pennsylvania v. Delaware Valley Citizens Council*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 429 (1986), *rev'd on other grounds*, —— U.S. ——, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). In this circuit, the amount compensable is measured by an examination of contemporaneous time records. *New York Ass'n. for Retarded Children v. Carey*, 711 F.2d 1136, 1147 (2d Cir.1983); *In re Hudson & Manhattan R.R.*, 339 F.2d 114, 115 (2d Cir.1964). These records should specify for each attorney the nature of the work, the date and hours expended. *Carey*, 711 F.2d at 1148.

SP & B's time records may not be completely contemporaneous. They consist of various memoranda to the file to which the time involved may have been added shortly after the May 10, 1988 hearing. Given the passage of only two or three months, they should enjoy some, but not all, of the status of contemporaneous time records. It was apparent to this Court at the hearing and in light of the SP & B presentation that SP & B had spent a fair amount of time on the matter. Moreover, given our experience in handling numerous fee requests, we find SP & B's claim of $180 per hour as its normal hourly rate to comport

with "reasonable compensation", as provided for by § 503(b)(4).

█ Although most of the memoranda provided to the Court fully specify the nature of the work that SP & B performed, the entries provided for February 16, 1988 and March 8, 1988 are inadequate and seem excessive. For those two dates, therefore, no compensation can be awarded. Compensation has been denied for entries which are inadequately described and appear excessive given the tasks performed. *In re Baldwin-United Corp.*, 79 B.R. 321, 337 (Bankr.S.D.Ohio 1987). The February 16th entry states that 4½ hours was spent reviewing the file in preparation for the February hearing. The March 9th entry shows that another 4½ hours was spent reviewing the entire file for the second hearing. On each of these occasions, an additional hour was spent reviewing the files the following day. That hour for each hearing should have been sufficient. Accordingly, SP & B's allowable time charges amount to 34½ hours times $180 or $6,210.

### IV.

█ In certain "rare" and "exceptional" cases a premium may be added to the lodestar. *Pennsylvania v. Delaware Valley Citizens Council*, 106 S.Ct. at 3098. Rather than seek a fee based on a multiplier, SP & B asserts a "salvage" claim of $75,000. This claim is without substantial merit.

In support of its claim, SP & B attempts to analogize its efforts on behalf of the estate to saving a ship in peril. "Salvage" analysis here, however, is clearly inapplicable. To determine that a salvage service was performed, a court must find a marine peril, service voluntarily rendered without duty or contract and success in whole or in part. *E.g., B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir. 1983). When property on land exposed to grave peril is saved by a volunteer, no remuneration is given. *Id.* at 337.

SP & B's reliance on *Tuffy v. Hammer*, 145 F.2d 447 (2d Cir.1944), to support a "salvage" argument is misplaced. In that case, a recovery of $18,000 was obtained and the court allowed an allowance of $6,750 in attorney's fees. In commenting upon the case, Judge Learned Hand wrote "... the recovery was really salvage and involved much labor, including an appeal to this court." *Id.* at 450. There is no indication, however, that Judge Hand had any intention of applying maritime salvage principles to a non-maritime case. The word is used merely to describe that the trustee took on a case that had few assets and yet managed to successfully pursue claims against the estates of two deceased persons. *See* 145 F.2d at 148. Moreover, the compensation sustained in *Tuffy* amounted to $6,750 for 1200 hours of work. That compensation does not reflect a salvage premium. Reading *Tuffy* fully confirms that the single word "salvage" may not be pulled out of context in order to support general acceptance of a "salvage" theory. Here, SP & B's effort towards saving the estate from selling the stock of the Arecibo mill for too little is clearly not the same as salvaging a ship in danger of sinking. In this case, the estate was not in "peril", nor is the asset involved a vessel.

We thus hold that SP & B is entitled to an award of $6,210. That sum represents reasonable compensation for its services on the basis of the time and nature of the services. It also reflects the value of those services. SP & B, in making the initial objection, conferred a substantial benefit to the estate. It however, did not, as it claims, make the sole objection. The adjournment, during which other bids arose, was requested by others and was granted so that a hearing could be held particularly with respect to the disinterestedness issue emphasised by the Debentureholders Committee.

For the foregoing reasons, the Debtor hereby is directed to pay SP & B the sum of $6,210. It is

SO ORDERED.